NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD JAVIER VELEZ SALTOS,<br><br>Petitioner,<br><br>v.<br><br>ERICA ZULAY CABANILLA SEVERINO,<br><br>Respondent. | Civil Action No.: 18-8704 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of Petitioner Ronald Javier Velez Saltos' emergency petition for the return of the seven-year-old minor child, R.C.[1], to Ecuador, pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 ("Hague Convention")[2] and the International Child Abduction Remedies Act, 22 U.S.C. § 9001, *et seq.*[3] (ECF No. 1). The Court has considered the written submissions of both Petitioner and Respondent Erica Zulay Cabanilla Severino, as well as the arguments and evidence presented on the record during an evidentiary hearing held on July 19, 2018. For the following reasons, the emergency petition is granted and R.C. is to be returned to Ecuador.

---

[1] Given the sensitive information discussed in this case and the young age of the minor child, the Court shall refer to the minor only as "R.C."
[2] The Hague Convention can be found at: https://www.hcch.net/en/instruments/conventions/full-text/?cid=24. For citations to the Hague Convention in this Opinion, the Court shall cite to "Hague Convention" followed by the appropriate Article of the Convention.
[3] Formally 42 U.S.C. § 11601 *et seq.*

# I. **FINDINGS OF FACT**[4]

## A. Credibility Determinations

As a preliminary matter, the Court finds the testimony of Petitioner to be by-and-large credible, especially as it pertained to the exercise of his custody rights. The Court reaches this conclusion because Petitioner's testimony was buttressed by other evidence presented on the record, including pictures of Petitioner and R.C. as well as receipts and official documents pertaining to Petitioner's custodial rights. The Court also finds Respondent's testimony credible on a number of issues, including her close relationship to R.C., Petitioner's less than perfect visitation with R.C., and Petitioner's child support payments. However, as will be further explained throughout this opinion, much of Respondent's testimony was not relevant to the Court's analysis, as it went to issues of custody or the terms of the separation and/or divorce of the parties, issues typically decided by the family court of the country of habitual residence, rather than the issue of R.C.'s removal under the Hague Convention, which is the issue before the Court.

As for the testimony of R.C., the Court finds that the minor child was extremely intelligent and impressively well-spoken, especially for a young girl who is barely seven years old. R.C. clearly loves her mother and the two share a strong bond, which is understandable considering Respondent has been R.C.'s primary caretaker throughout R.C.'s life. Nevertheless, the Court also recognizes that R.C. has been living with, and under the influence of, Respondent in New Jersey for the past year, and that therefore R.C.'s testimony must be viewed in that context and given somewhat diminished weight.

---

[4] The Court's findings are based on the parties' submissions and evidence presented on the record during the July 19, 2018 hearing. The facts of this case are largely uncontested by the parties, and the Court shall set forth only those facts it considers relevant to the dispute. To the extent that any findings of fact are better categorized as conclusions of law, or vice versa, they are adopted as such.

2

## B. Background and Procedural History

Petitioner is the father of R.C., a citizen of Ecuador, and is currently living in Ecuador. (ECF No. 1 ("Compl.") ¶ 10). Respondent is R.C.'s mother, a citizen of Ecuador, and currently residing in New Jersey with her new husband, Dalton Mejia, who is an American citizen. (Hr'g Tr.[5] at 4:16–17, 72:3–6, 123:2–3). Petitioner and Respondent were married in Ecuador on February 13, 2010, and had R.C. on July 7, 2011. (ECF No. 1 ("Compl.") ¶ 16). R.C. was born in Ecuador and lived there for the first five years of her life. (Hr'g Tr. at 16:16–19). The parties separated in February 2012, and later divorced on December 7, 2016. (Compl. ¶ 17).

On November 23, 2012, the parties entered into a custody agreement, whereby R.C. would live with Respondent, and Petitioner would have visitation rights from 5:30 p.m. to 9:30 p.m. on weekdays, and noon to 5:00 p.m. on the last Sunday of each month. (ECF No. 17, Ex. P3). An Ecuadorian Court approved the custody agreement the following day. (*Id.*). Petitioner testified that, because R.C. was very young at the time of the custody agreement, the Ecuadorian Court thought it would be best for her to be in the primary care of her mother. (Hr'g Tr. at 22:19–24). According to Petitioner, the Ecuadorian Court told him that once R.C. was about five, Petitioner could increase the amount of time he can spend with R.C. and be given overnight visits. (Hr'g Tr. at 22:24–23:2). Regardless, the record indicates that Petitioner spent time with R.C. under the terms of the agreement, which included seeing R.C. at school and for birthdays and holidays, as well as taking R.C. to visit his three other children from a prior marriage. (Hr'g Tr. at 24:17–19, 25:22–26:4; ECF No. 17, Exs. P8–62 (photographs documenting same)). On one occasion in April 2017, R.C. was hospitalized with an infection and Petitioner stayed overnight in the hospital with

---

[5] The Court shall cite to the hearing held on July 19, 2018 with the abbreviation "Hr'g Tr." followed by the appropriate page and line number.

her. (Hr'g Tr. at 40:25–41:14; ECF No. 17, Ex. P8 (picture showing R.C. and Petitioner together in the hospital)).

Petitioner was also required to pay child support to R.C. and his other three children in the amount of $800 per month. (Hr'g Tr. at 38:22–39:3, 62:18–19). Petitioner's child support payments for R.C. were made through a judicial process pursuant to a court order. (Hr'g Tr. at 37:18–38:2). Under Ecuadorian law, Petitioner was prohibited from leaving the country because he was paying child support through a court order. (Hr'g Tr. at 27:7–19). At some point after the separation, Petitioner declared bankruptcy and, based on financial status and inability to make the child support payments, the amount that Petitioner paid in child support was reduced.[6] (Hr'g Tr. at 37:8–13, 38:21–39:5). Because Petitioner fell behind on his payments, Respondent alleges that Petitioner owed about $5,000.00 in child support arrears. (Hr'g Tr. at 110:14–16). Respondent also claims that Petitioner cancelled R.C.'s medical insurance, which Petitioner clarified was automatically cancelled after he declared bankruptcy, and that the child support payments were supposed to cover health insurance. (Hr'g Tr. 39:6–22).

In early April 2017, Respondent informed Petitioner that she wanted to take R.C. on vacation to Disney World in Orlando, Florida from April 23, 2017 to May 1, 2017, and wanted Petitioner to authorize the travel.[7] (Compl. ¶ 24). According to Petitioner, he expressed concerns that, if something were to happen to R.C., he would be unable to travel to the United States because the court-mandated child support payments prevented him from travelling. (Hr'g Tr. at 27:15–25). Therefore, Petitioner would only agree to authorize Respondent and R.C.'s trip if Respondent removed her claim with the court that he owed $5,000.00 in child support payments, and agree to

---

[6] In 2016, the amount Petitioner was required to pay in child support was reduced to the "basic" amount of $108. (Hr'g Tr. at 111:6–14).
[7] The parties agree that, under Ecuadorian law, a child can travel abroad with one parent only if the other gives express consent and both parents complete the necessary travel forms. (Compl. ¶ 23; Hr'g Tr. at 106:2–5).

4

let Petitioner pay child support directly to Respondent instead of through the court. (Hr'g Tr. at 27:15–25, 57:6–17). Respondent indicated that she reluctantly agreed, and the parties completed the necessary exit permit for R.C. to travel from April 23, 2017 to May 1, 2017. (Compl. ¶¶ 25–26; Hr'g Tr. at 35:5–12, 105:24–106:5). Before the trip to Orlando, Petitioner paid a portion of R.C.'s school registration fees, and Respondent enrolled R.C. for the upcoming school year in Ecuador. (Compl. ¶ 27; Hr'g Tr. at 114:13–115:5; ECF No. 17, Ex. V).

On April 23, 2017, Respondent and R.C. traveled to the United States from Ecuador. (Compl. ¶ 28). On April 30, 2017, Petitioner received an anonymous phone call informing him that Respondent intended on remaining in the United States with R.C. (Compl. ¶ 29). On May 1, 2017, Respondent called Petitioner and explained that her then-boyfriend, Dalton Mejia, proposed, and that Respondent will be staying in the United States with R.C. permanently, in order to give R.C. more opportunities for her future. (Compl. ¶ 30; Hr'g Tr. at 104:25–105:3). At no time prior to this phone call did Respondent tell Petitioner that she intended to get married in the United States or that she intended on taking R.C. to New Jersey. (Hr'g Tr. at 28:20–29:1, 30:1–9).

Respondent and R.C. then traveled from Orlando, Florida to Union, New Jersey, where they still reside today. (ECF No. 14-1 at Ex. A). R.C. was five at the time. (Hr'g Tr. at 70:14–15). R.C. completed first grade in New Jersey and was enrolled at Hannah Caldwell School, where she has been excelling both academically and socially. (ECF No. 14 at 8). Specifically, R.C. received high marks, has many friends at school, had her artwork displayed during an art gala event, and plays on the softball team. (Hr'g Tr. at 71:10–25, 86:1–4, 125:19–20; ECF No. 14-1 at Ex. K). Furthermore, R.C. is very happy living in New Jersey with her mother, their two dogs, and her step-father Dalton Mejia, whom she calls "Daddy Dalton." (Hr'g Tr. at 72:3–12).

Since May 1, 2017, Petitioner has been unable to contact R.C. (Compl. ¶ 31). On one occasion in 2018, Respondent sent photos and audio of R.C. to Petitioner, but Respondent has not otherwise communicated with Petitioner. (Hr'g Tr. at 59:2–22). In light of the above facts, Petitioner filed this emergency petition with the Court on May 1, 2018. (*See* Compl.). Service of the emergency petition was made on Respondent, (ECF No. 3), and the Court issued an Order to Show Cause why R.C. should not be returned to Ecuador, (ECF No. 4). The Court scheduled a hearing for July 10, 2018. (*Id.*). However, Respondent failed to respond to the Order to Show Cause or otherwise appear in this case until July 6, 2018.[8] (ECF No. 8). Therefore, the Court adjourned the hearing, which was instead held on July 19, 2018. (ECF No. 13).

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

This Court has jurisdiction pursuant to 22 U.S.C. § 9003(a), which provides that "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." Both the United States and Ecuador are contracting states under the Hague Convention. (Compl. ¶ 2). Accordingly, this Court has subject matter jurisdiction over this action.

### B. Legal Standard

The purpose of the Hague Convention is to provide a legal process in order "to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010) (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270 (3d Cir. 2007)). A decision

---

[8] Respondent explained that her failure to respond was because she initially hired a different attorney to respond to the Order to Show Cause, but that attorney was apparently disbarred after taking Respondent's case for unrelated reasons. (ECF No. 10 at Ex. A).

6

under the Hague Convention solely concerns the return of the child, and should not be taken as a determination of custody. Hague Convention, Article 19.

For a child to be returned under the Hague Convention, the petitioner must prove by a preponderance of the evidence that the child's habitual residence was in a signatory State and that the child was wrongfully removed. *Karpenko*, 619 F.3d at 263 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir.2006)). Pursuant to Article 3 of the Hague Convention,

> The removal or retention of a child is to be considered wrongful where –
>
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, Article 3.

In determining whether Plaintiff has made out a *prima facie* claim for relief under the Hague Convention, the Third Circuit has instructed courts to answer the following questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Karkkainen*, 445 F.3d at 287.

Once petitioner asserts a *prima facie* claim, the burden shifts to the Respondent opposing the removal of the child to assert one of the affirmative defenses articulated in the Hague Convention. *Id.* at 288. "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention and, even where a defense applies, the court has the discretion to order

7

the child's return." *Id.* (citations omitted). Pursuant to the Hague Convention, a respondent can prove any of the following affirmative defenses:

> (1) that a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation [proven] by clear and convincing evidence; (2) that the child's return would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms [proven] by clear and convincing evidence; (3) that the child is now settled in his or her new environment [proven] by preponderance of the evidence; (4) that the person from whom the child was removed was not exercising custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention [proven] by preponderance of the evidence; or (5) that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views [proven] by preponderance of the evidence.

*Karpenko*, 619 F.3d at 263 n.3; *see also* 22 U.S.C.A. § 9003(e)(2) (setting forth the burdens for each affirmative defense).

Should a court order that a child be returned to a petitioner pursuant to the Convention, it must also order "the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 22 U.S.C. § 9007.

## C. Petitioner's Burden

1. Date of Wrongful Retention

The first step is for the Court to determine what date the allegedly wrongful retention occurred, "so as to establish the relevant date of [R.C.'s] habitual residence for purposes of the Convention." *Karkkainen*, 445 F.3d at 290. In situations where parents mutually agree to permit their child to travel outside their home country with one parent for a specified period of time, courts

8

in the Third Circuit have found that the retention date occurs when the travelling out of state parent fails to return the child. *See Karkkainen*, 45 F.3d at 290; *Paulus v. Cordero*, No. 12-986, 2012 U.S. Dist. LEXIS 90374, at *8 (M.D. Pa. June 29, 2012). Here, the parties agreed that R.C. would travel to the United States from April 21, 2017 until May 1, 2017. (Compl. ¶¶ 25–26). Additionally, Petitioner testified that he expected R.C. to return to Ecuador on May 1, 2017. (Hr'g Tr. at 27:24, 31:12–13). Therefore, the date the allegedly wrongful retention occurred was May 1, 2017.

2. Habitual Residence

The Third Circuit has defined "habitual residence" as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Karpenko*, 619 F.3d at 263 (quoting *Karkkainen*, 445 F.3d at 291–92). In making this determination, courts must consider the "child's experience in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered in a country prior to the retention date." *Karkkainen*, 445 F.3d at 292 (internal quotation marks, citation, and alterations omitted). The parties in this case do not dispute that R.C.'s habitual residence prior to her allegedly wrongful retention was Ecuador, which is bolstered by the fact that R.C.'s family, school, and entire life was in Ecuador prior to her trip to Orlando, Florida. (Hr'g Tr. at 6:15–20, 16:16–19). Therefore, R.C. was a habitual resident of Ecuador before her allegedly wrongful retention in the United States.

3. Breach of Petitioner's Custody Rights

For purposes of the Hague Convention, the custody rights of the parents are determined by the law of the origin country. *Tsai-Yi Yang*, 499 F.3d at 275. According to Petitioner,

9

Respondent's wrongful retention violated his custody rights under Ecuadorian law, which hold that both parents have joint custody unless there is a court order to the contrary. (Compl. ¶ 18). Here, there is no court order that terminated Petitioner's joint custody rights. (Compl. ¶ 19; Hr'g Tr. at 23:10–11). Additionally, Petitioner asserts that R.C.'s wrongful retention violates his rights under the custody agreement entered into by the parties on November 23, 2012. (Compl. ¶ 20). Respondent concedes that Petitioner has joint custody based on this custody agreement. (ECF No. 14 at 4). Pursuant to the custody agreement, Petitioner was entitled to visit R.C. from 5:30 p.m. to 9:30 p.m. on weekdays, and noon to 5:00 p.m. on the last Sunday of the month. (ECF No. 17. Ex. P3). Petitioner has been unable to exercise these rights or otherwise contact R.C. since May 1, 2017, when R.C. was retained in the United States without his consent. (Compl. ¶ 22). Therefore, Petitioner has shown by a preponderance of the evidence that his custody rights were breached by R.C.'s allegedly wrongful retention in the United States.

4. Petitioner was Exercising His Custody Rights

It is not a high burden for a parent to show they were exercising their custody rights, rather it only requires that the parent "kept or sought to keep some[] sort of regular contact with the child." *Tsai-Yi Yang*, 499 F.3d at 277 (citing *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005)). Here, Petitioner acted on his custody rights by seeing R.C. whenever he was permitted under the custody agreement. For example, Petitioner attended R.C.'s school for Father's Day and other events, stayed over in the hospital with R.C. when she was sick, celebrated R.C.'s birthdays with her, and took R.C. to visit her half-sisters. (Hr'g Tr. at 24:17–19, 25:22–26:4; ECF No. 17, Exs. P8–62 (photographs documenting same)). Petitioner testified that would have spent more time with R.C., had the Ecuadorian court permitted it. (Hr'g Tr. at 5–13). When R.C. was living in New Jersey, Petitioner was unable to speak with her despite his attempts to contact Respondent.

(Hr'g Tr. at 59:10–18). Based on these facts, it is clear to the Court that Petitioner was sufficiently exercising his custody rights at the time of R.C.'s retention in the United States. Therefore, Petitioner has made out a *prima facie* case that Respondent wrongfully retained R.C. in the United States in violation of the Hague Convention.

**D. Respondent's Affirmative Defenses**

In her brief and at oral argument, Respondent asserted several of the affirmative defenses recognized by the Hague Convention. These affirmative defenses included: (1) that R.C. has been here for at least a year and is well settled in her home and school in New Jersey, where she is excelling socially and academically; (2) that R.C. is of sufficient maturity and has articulated her desire to stay in the United States and does not want to return to Ecuador; (3) that Petitioner was not exercising his custody rights because he did not visit or care for R.C. as articulated in the custody agreement; and (4) that R.C. would be exposed to a "grave risk of harm" if she is returned to Ecuador, based on (a) the possible abuse she may face under Petitioner's care and (b) the human rights concerns associated with Ecuador, including the sexual exploitation of minors. (*See* ECF No. 14). The Court will address each affirmative defense in turn.

1. The "Well-Settled" Exception

Pursuant to Article 12 of the Hague Convention, which contains the "well-settled" exception, if a child has been wrongfully removed and "at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, *a period of less than one year* has elapsed from the date of the wrongful removal or retention," the Court shall order the return of the child. Hague Convention, Article 12 (emphasis added). However, the Court may choose not to return the child, "where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding [sentence],"

11

and it is demonstrated that "the child is now settled in its new environment." *Id.* The one-year period articulated in the exception is not subject to equitable tolling. *Lozano v. Montoya Alvarez*, 134 S.Ct. 1224, 1231 (2014). Here, Petitioner filed this emergency petition on May 1, 2018. (*See* Compl.). Petitioner argues in his brief that the wrongful retention began on May 2, 2018, and that his emergency petition was therefore filed less than a year later. (ECF No. 15 at 6). However, as the Court has already analyzed and determined above, *supra* Section II.C.1, the date of R.C.'s wrongful retention was May 1, 2017. Therefore, R.C.'s wrongful retention falls into the year or more required for Respondent to invoke Article 12's "well-settled" exception.

Nevertheless, Respondent has not shown by a preponderance of the evidence that R.C. is "well-settled" within the meaning of Article 12. A court does not find for respondent merely because the one-year period articulated in Article 12 has expired. *Lozano*, 123 S.Ct. at 1234. Upon finding that a year or more has passed, the Court must weigh several factors "informative of the child's connection with his or her environment," including

> the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the mother's employment or other means of support, whether the child has friends and relatives in the area, and to what extent the child has maintained any ties to the country of habitual residence.

*Silvestri v. Oliva*, 403 F. Supp. 2d 378, 387–88 (D.N.J. 2005) (citation omitted).

It is true that several of these factors weigh in favor of Respondent. For example, R.C. is excelling in her new school both academically and socially, as evidenced by the high marks she received in her first-grade classes, her making friends at school, and her participation on the softball team. (ECF No. 14 at 8; ECF No. 14-1 at Ex. D; Hr'g Tr. at 86:1–4, 125:19–20). Additionally, R.C. had her art displayed at an art gala, is able to speak in both English and Spanish, and has close relationships to her teachers. (ECF No. 14 at 8; ECF No. 14-1 at Exs. D, K; Hr'g

Tr. at 11:4–9, 71:10–25). The Court also finds that R.C. has had a stable living environment for the past year, as she has been residing consistently in Union, New Jersey with her mother, stepfather, and their two dogs. (Hr'g Tr. at 72:3–12). Respondent has asserted that R.C.'s needs are provided for both emotionally and financially, (ECF No. 14 at 8), and R.C. testified that she likes living in New Jersey, (Hr'g Tr. at 72:3–12).

Though the Court has considered these factors, there are very serious concerns that weigh against applying the "well-settled" exception to this case. First, the majority of R.C.'s family lives in Ecuador, including her grandparents who R.C. remains in contact with. (Hr'g Tr. at 81:11–17). Second, as this Court discussed previously, R.C. is at the very young age of seven, and her testimony is to be weighed accordingly. Furthermore, R.C.'s desire to remain in the United States is in part based on her living with, and under the influence of, Respondent. Notably, when R.C. was asked what she would want to do if her mother returned to Ecuador, R.C. responded, "I will go back to Ecuador because wherever [Respondent] is, I am. I am with her because we are a team." (Hr'g Tr. at 83:18–22). This exchange, along with others, indicates to the Court that R.C.'s preference for New Jersey has less to do with her life in the United States, and more to do with being close to her mother. Last, and perhaps most important, Respondent and R.C. currently have an uncertain immigration status. Both Respondent and R.C. came to this country on a travel visa to Orlando, Florida, which was for a limited period of eight days. (Compl. ¶¶ 25–26; Hr'g Tr. at 101:25–102:1). They then flew to New Jersey and have remained there till today. (ECF No. 14-1 at Ex. A). Respondent's Husband, Dalton Mejia, is an American citizen and is currently filing relative petitions for Respondent and R.C. to remain in the United States. (ECF No. 14 at 7). However, the Court is not convinced that Respondent and R.C.'s ability to remain in this country is certain, as they are vulnerable to deportation in the event that their relative petitions are denied.

This fact, in conjunction with the other factors weighing against Respondent, outweighs those factors supporting the application of the "well-settled" exception. Therefore, the Court finds that Article 12's "well-settled" exception does not apply to this case.

2. The "Wishes of the Child" Exception

For similar reasons as those expressed above, the Court finds that Article 13's second-to-last paragraph, also known as the "wishes of the child" exception, does not apply to this case either. Under the "wishes of the child" exception, a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13. "The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis." *Tsai-Yi Yang*, 499 F.3d at 279. In *Tsai-Yi Yang*, the District Court found, and the Court of Appeals affirmed, that a ten-year-old child was not of sufficient age or maturity for her views to be appropriately considered. *Id.* The District Court based this determination on the fact that the ten-year-old child testified generally that she preferred to stay in the United States, rather than particularized objections to returning to Canada. *Id.* Though the ten-year-old child did express some objections to returning to Canada, they were "not necessarily sufficient" to meet the exception. *Id.*

Here, R.C. testified about how much she likes New Jersey, that she does not miss Ecuador, and that she does not want to return to Ecuador. (Hr'g Tr. at 72:7–8, 74:20–21, 78:15–22). The most specific example R.C. gave as to why she does not want to return to Ecuador is that her half-sisters will tease her and pull her hair when they visit her. (Hr'g Tr. 77:3–11, 81:3–7). R.C. also testified that she wants to remain in the United States because she prefers her school here. (Hr'g Tr. at 78:15–22). However, much like the minor child in *Tsai-Yi Yang*, 499 F.3d at 279, R.C.'s

14

testimony is more focused on why she prefers New Jersey, rather than why she specifically objects to returning to Ecuador. Additionally, R.C.'s objections to returning to Ecuador, namely fighting with her half-sisters or missing her school, are those expected of a seven-year-old girl and are not enough for the Court to disregard the narrow grounds in which the "wishes of the child" exception applies. *Id.* Furthermore, R.C., who is seven years old, is even younger than the ten-year-old child in *Tsai-Yi Yang* who was found not to be old or mature enough for the exception to apply. *Id.* Therefore, though the Court was very impressed with R.C.'s testimony, it still finds that R.C. was not of a sufficient age or maturity for Article 13's "wishes of the child" exception to apply.

### 3. Petitioner Exercising Custody Rights

Pursuant to Article 13(a) of the Hague Convention, the Court need not return the child if Petitioner "was not actually exercising [his] custody rights at the time of removal or retention." Respondent must meet a high standard for this exception, as "[e]ssentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights." *Tsai-Yi Yang*, 499 F.3d at 277 (citing *Baxter*, 423 F.3d at 370).

Here, Respondent argues that Petitioner forfeited his custody rights because he failed to visit R.C., owed over $5,000 in child support payments, and refused to pay for R.C.'s hospital bills. (Hr'g Tr. at 107:20–23, 110:14–15, 117:10). However, as the Court already determined above, *supra* Section II.C.4, Petitioner made substantial efforts to see R.C. pursuant to the agreement, which is all that is required to show Petitioner was exercising his custody rights. *Tsai-Yi Yang*, 499 F.3d at 277 (citing *Baxter*, 423 F.3d at 370). The Court's conclusion that Petitioner was exercising his custody rights is supported by the testimony of the witnesses and a wide assortment of photographs identifying same. (Hr'g Tr. at 24:17–19, 25:22–26:4; ECF No. 17, Exs. P8–62 (photographs documenting same)). In fact, Petitioner testified that most of the times he did

not visit R.C. was because R.C. was sick or it was inconvenient for Respondent's schedule. (Hr'g Tr. at 54:5–21). Respondent's remaining arguments regarding payment of certain expenses are not necessarily relevant to the high standard required to show that Petitioner was not exercising his custody rights, *i.e.*, abandonment. *Tsai-Yi Yang*, 499 F.3d at 277 (citing *Baxter*, 423 F.3d at 370). Therefore, the Court finds that Respondent has not set forth sufficient facts to support the application of the exception articulated in Article 13(a) of the Hague Convention.

4. The "Grave Risk of Harm" Exception

Pursuant to Article 13(b) of the Hague Convention, the Court need not return the minor child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Respondent must show the "grave risk of harm" exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). This exception applies in two circumstances: (1) when the return of the minor child puts him or her in "imminent danger," because the minor child is returning to "a zone of war, famine, or disease"; and (2) when returning the minor child would subject him or her to "serious abuse or neglect," where the country of habitual residence is incapable or unwilling to adequately protect the minor child. *Baxter*, 423 F.3d at 373 (citations omitted). A thorough review of the record in this case and Respondent's arguments compels the Court to conclude that there is no clear and convincing evidence that R.C. would suffer a grave risk of physical or psychological harm should she be returned to Ecuador.

First, R.C. is not at risk of serious abuse or neglect if she returns to Ecuador. Respondent claims that she has always been R.C.'s primary caretaker and to remove R.C. to Petitioner, whom she has not formed the same type of bond with, would cause R.C. great distress. (Hr'g Tr. at 10:1–10). R.C. also testified that she is afraid to return to Ecuador because she would no longer live

16

with her mother. (Hr'g Tr. at 81:9–10). Though the Court has no doubt that R.C. and her mother share a very close connection, the distress caused from separating a child from their parent with whom they have a strong bond is generally not considered a grave psychological harm in cases brought under the Hague Convention. *See, e.g., Carranco v. Munoz*, Civil Action No. 12-7299, 2013 WL 150760, at *9 (D.N.J. Jan. 14, 2013) (citations omitted). Respondent also insinuated that Petitioner may be physically violent, and that he has political connections in the Ecuadorian government gained from his mother's magazine company, which allow him to influence the police and courts. (Hr'g Tr. at 105:5–11, 108:4–9, 119:14–17). Specifically, Respondent testified that Petitioner acted "[d]rastically and with violence" when they separated and threatened to throw her down a flight of stairs. (Hr'g Tr. at 119:7–17). However, Respondent's arguments regarding violence or undue political influence were not articulated with enough specificity, or corroborated with other evidence, in order for Respondent to meet her burden. Respondent never testified that Petitioner physically harmed her or R.C. In fact, R.C. conceded that Petitioner was always very nice to her and that Petitioner never pulled her hair. (Hr'g Tr. at 92:14–17). Additionally, outside of Respondent's testimony, there is no other mention or example in the record of Petitioner's undue political influence over the Ecuadorian government. Therefore, the Court rejects both of Respondent's arguments regarding R.C.'s risk of serious abuse or neglect in Ecuador.

The Court also finds that returning R.C. to Ecuador will not result in any risk of "imminent danger." Respondent argues that the conditions in Ecuador make the country "not a safe place for a child." (ECF No. 14 at 8). For support, Respondent points to a 2017 Human Rights Report of Ecuador which reported high amounts of sexual abuse and exploitation of children. (*Id.* at 8–9). While this report is disturbing, it is not relevant to the Court's determination, as it does not directly affect R.C. *See Baxter*, 423 F.3d at 373. Respondent conceded that "there is no direct evidence"

17

to suggest that R.C. was or will be exposed to sexual abuse or exploitation in her hometown in Ecuador. (Hr'g Tr. at 11:18–19). Furthermore, the unfortunate fact that sexual abuse or exploitation can occur in Ecuador, like it can occur in almost any country, does not rise to the level of imminent danger articulated by the "grave risk of harm," *i.e.*, a war zone or the outbreak of a deadly virus. *See Baxter*, 423 F.3d at 373. Respondent also argues that the school system in the United States offers more opportunity than that of Ecuador. (ECF No. 14 at 9). However, the loss of economic or educational opportunities alone does not rise to the level of "a grave risk of harm." *See Baxter*, 423 F.3d at 373 (quoting *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir.2001)). Therefore, the Court rejects both of Respondent's arguments regarding R.C.'s risk of "imminent danger," and finds that Respondent cannot meet Article 13(b)'s "grave risk of harm" requirements as to apply the exception to this case.

Finally, even if any of the exceptions articulated above could be met, the Court would still act in its discretion to remove R.C., as almost all of Respondent's arguments are focused on custody and the best interest of the child. Though Respondent's desire to give R.C. a bright future is understandable, and the Court has no doubt that both parents love R.C. and only want what is in her best interest, the actions that gave rise to this case are exactly what the Hague Convention is trying to prevent, *i.e.*, international forum shopping to determine custody disputes. *See Karpenko*, 619 F.3d at 263. This Court is not the appropriate forum for the parties to decide which parent should have custody of R.C. or in which country R.C.'s interests would best be served. Therefore, the Court must act in line with the Hague Convention and order that R.C. be returned to Ecuador.

### III. <u>CONCLUSION</u>

For the foregoing reasons, this Court holds that Petitioner has satisfied his burden of proving, by a preponderance of the evidence, that Respondent has wrongfully retained R.C. in

18

New Jersey in violation of the Hague Convention. Because Respondent has failed to establish an affirmative defense, Petitioner's emergency petition is hereby granted and R.C. should be returned to Ecuador. Respondent must pay all costs and fees in connection with this matter unless she establishes that it would be "clearly inappropriate" for this Court to order her to pay such costs and fees. *See* 22 U.S.C. § 9007(b)(3). An appropriate Order follows this Opinion.

Dated: July 25th, 2018.

_____
JOSE L. LINARES
Chief Judge, United States District Court